UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NANCY BRETON, | ) | |
| Personal Representative of the | ) | |
| Estate of Kenneth L. Breton, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-09-20-B-W |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION

In an action tried before the Court under the Federal Tort Claims Act (FTCA), the Court concludes that the Estate of Kenneth L. Breton (the Estate) failed to demonstrate that the Togus Veterans Administration Medical Center (Togus) committed medical malpractice under Maine law. The Court grants judgment in favor of the United States of America.

## I.    STATEMENT OF FACTS

### A.    Kenneth Breton, Cancer, the Colostomy, and the Resection

In September, 2006, Kenneth Breton, a fifty-four year old Vietnam veteran, learned that he had cancer. After presenting at Togus on September 15, 2006 with symptoms of fatigue, weight loss, stomach cramping, and a history of anemia, Mr. Breton underwent a computed tomography scan (CT or CAT scan), which revealed findings suspicious of interval development of

metastatic liver disease. Ex. 1-A, *Pl.'s Togus Hospital Medical Records* at 343 (*Togus*).[1]   On September 21, 2006, Mr. Breton underwent a flexible sigmoidoscopy and esophagogastroduodenoscopy (EGD), which identified a cancerous lesion in his lower rectum, causing a partial obstruction of his bowel. Ex. 1-B, *Pl.'s Mayo Regional Hospital Medical Records* at 4-5 (*Mayo*); *Togus* at 563.[2]   Unfortunately, Mr. Breton's colon cancer had spread throughout his liver. Although the primary tumor in his colon was eventually removed, Mr. Breton required immediate chemotherapy for his inoperable liver metastases. *Tr.* 19:18-22 (Docket # 39 & 40) (*Tr.*) (Dr. Bossart's testimony and Plaintiff's counsel's concession that the extent of the metastases made the liver inoperable). Even though Mr. Breton's liver disease was inoperable, it was essential to initiate chemotherapy as quickly as possible to extend his life and to improve its quality. *Tr.* 98:2-7; 104:23-25; 105:1-2.

Before he could receive chemotherapy, however, Mr. Breton's bowel obstruction had to be resolved. *Togus* at 326, 586. Togus acted quickly. On September 26, 2006, Mr. Breton was referred to an oncologist, who recommended a surgical consult with Dr. Karel Jan Bossart, a Togus general

---

[1] A "metastatic" disease is a disease that spreads from one organ to a non-adjacent organ.

[2] A "flexible sigmoidoscopy" uses a flexible endoscope to measure the large intestine from the rectum through the last part of the colon. Although similar to a colonoscopy, a sigmoidoscopy examines only up to the sigmoid, while a colonoscopy examines the entire large intestine. An "esophagogastroduodenoscopy" examines the upper gastrointestinal tract and also uses an endoscope.

surgeon of fourteen years. *Id.*; *Tr.* 15:2-6. On September 28, 2006, Dr. Bossart performed a mid-transverse loop colostomy. *Togus* at 118.[3]

Significantly, Dr. Bossart conceded that he did not inform Mr. Breton of an alternative procedure for removing his bowel obstruction: surgical resection of the colon tumor. *Tr.* 26:2-11.[4] Nor did he create a record of his surgical consult with Mr. Breton. *Id.* 17:16-23. About four weeks later, Mr. Breton began a course of chemotherapy, which was remarkably successful. Dr. Berger, one of the medical experts, testified that people with metastatic liver disease who do not receive chemotherapy have an average life expectancy of only six to nine months, and with chemotherapy, the life expectancy increases to only a year to a year and a half. *Id.* 171:16-18. Having received such a dire diagnosis in early September 2006, Mr. Breton, lived nearly three more years, succumbing to the disease on August 5, 2009.

Although his cancer treatment was successful, Mr. Breton's experience with his colostomy was not.[5] Mr. Breton initially responded well to the surgery, but by November 20, 2006, a doctor noted an itchy skin rash surrounding the stoma site.[6] *Togus* at 188, 193-194. By January 16, 2007, Mr. Breton had developed a prolapsed colostomy, meaning that a portion of

---

[3] A loop colostomy involves a large "stoma," or surgical opening, in the bowel. A surgeon sutures a portion of the bowel to the patient's abdomen, allowing stool to exit the patient's body through the stoma rather than the anus.

[4] A surgical resection removes from the patient either the entire tumor or a portion of the cancerous lesion in order to unblock the bowel.

[5] Neither Mr. Breton nor his Estate claims the colostomy was performed without the proper standard of care.

[6] A stoma is either a natural or surgically created opening in the body connecting the inside to the outside.

his bowel was extending outward from the hole in his stomach. *Id.* at 193; *Tr.* 31:4-8. In Mr. Breton's case, the bowel extended out about six inches from his stomach. *Tr.* 31:8-9. To address this problem, Mr. Breton met again with Dr. Bossart on January 18, 2007, who manually pushed his extended bowel into his abdomen and recommended that he return to the clinic for further evaluation. *Togus* at 447; *Tr.* 31:15-32:6. Dr. Bossart testified that he probably would have discussed with Mr. Breton the possibility of resecting the colon tumor at that time. *Tr.* 26:17-20. Mr. Breton, however, did not follow up with Dr. Bossart. *Id.*

Rather, on January 30, 2007, at the recommendation of a fellow Vietnam veteran, Mr. Breton went to see Dr. Richard Cabot, a Dover-Foxcroft general and vascular surgeon. Mr. Breton presented with complaints about his difficulties with his colostomy, including significant pain from the prolapsed colostomy. *Id.* 39:17-23.[7] On March 26, 2007, Dr. Cabot performed a revision of the colostomy site and resected the colon tumor. Ex. 1-B, *Pl.'s Millinocket Regional Hospital Records* at 28 (*MRH*). Although he developed a wound infection sometime in mid-April, Mr. Breton recovered reasonably well from Dr. Cabot's surgery and was able to live the rest of his days with a normally functioning bowel. Ex. 1-B, *Millinocket Surgical Associates Records* at 11 (*MSA*); *Tr.* 83:22-84:6.

**B.     The Plaintiff's Claim**

---

[7] For a patient with a protruding bowel as large as Mr. Breton's, Dr. Cabot explained that it is not uncommon for patients to develop "significant leaks . . . [and] irritation." *Tr.* 43:11-21.

### 1. Ecstatic and Angry

Mr. Breton's sister, Nancy Welch, described how acutely her brother suffered through the colostomy. A gregarious and active man, Mr. Breton had moved to Mattawamkeag, Maine just before the cancer diagnosis, and had been enjoying life, building a house, working outdoors, and socializing. *Tr.* 136:6-14. The colostomy took an awful toll on Mr. Breton. Constantly fearful that the bag would fill and break, spilling feces over his stomach, Mr. Breton withdrew and spent more and more time alone at home. *Id.* 135:4-17. Mr. Breton even became reluctant to go to restaurants and when he did, he would often leave in the middle of a meal. *Id.* 135:18-136:1, 136:22-137:2. Ms. Welch summed up Mr. Breton's troubles by quoting her brother: "I feel so dirty . . . . I can't stand it. And he cried." *Id.* 136:1-3.

The Estate claims that Togus, through Dr. Bossart, committed medical malpractice in three ways. First, it argues that the standard of care required Dr. Bossart to document his initial surgical consult. *Pl.'s Post Trial Br.* at 9. (Docket # 41) (*Pl.'s Br.*).

Next, the Estate contends that Dr. Bossart violated the standard of care when he recommended and performed a colostomy instead of a colon resection in September 2006. *Id.* at 11. Because Mr. Breton had only a partially obstructing lesion that was "bleeding actively at the time that Dr. Bossart did his surgery," the Estate says the appropriate standard of care required the surgical resection of the colon tumor so that it would not enlarge

and fully obstruct or even perforate the bowel. *Tr.* 9:7-12. The Estate argues that instead of a performing a colostomy in September 2006, Dr. Bossart should have removed the tumor then and there, rather than in March 2007. If the colon lesion had been removed in September 2006, the Estate argues that Mr. Breton would have resumed normal bowel function, thereby avoiding the problems he endured from the colostomy.

At the very least, the Estate says Dr. Bossart should have told Mr. Breton that surgical resection was an alternative. *Pl.'s Br.* at 11. The Estate argues that the standard of care obligated Dr. Bossart to explain the countervailing risks and benefits of the resection and the colostomy to allow Mr. Breton to make an informed decision as to which procedure he preferred. *Tr.* 9:16-21. The Estate asserts that "it is clear from the [expert] testimony . . . that [he] would have chosen to have the resection had that option been presented to him." *Id.* 9:21-24. When he found out in January 2007 that the colostomy could be taken down and the colon tumor removed, his sister said that he felt both "ecstatic and angry": ecstatic that normal bowel functions could be restored and angry that he had not been told about this possibility earlier. *Id.* 139:20-140:2. The Estate sues the Government for all medical expenses, pain and suffering, and loss of enjoyment of life between September 2006 and March 2007 that Mr. Breton suffered because of the allegedly unnecessary colostomy. *Pl.'s Br.* at 11.

### 2.    Dr. Richard Cabot

The Estate supports its claims through the testimony of Dr. Richard Cabot, who testified as a treating physician and designated expert. Dr. Cabot is a graduate of Dickinson College and Cornell University Medical School. He received post graduate training at Stanford University before returning to New York City to teach surgery and engage in private practice. In 1988, he left New York and moved to rural Maine to enjoy a higher quality of life, and he maintained surgical practices in Dover-Foxcroft, Millinocket, Lincoln, and Greenville, Maine until his retirement in 2007.

When he first saw Mr. Breton in January 2007, Dr. Cabot could not understand why Dr. Bossart had not already resected the primary tumor in Mr. Breton's colon. *Tr.* 44:5-7. Although ultimately a surgical judgment, Dr. Cabot explained a surgeon's recommendation for patients like Mr. Breton is guided by a number of factors. *Id.* 52:11-12. First, a surgeon reviews the radiologist's CT scan for indications of liver metastases. *Id.* 51:23-25. Dr. Cabot explained that many surgeons use a fifty percent cutoff: if the liver metastases involve over fifty percent of the liver, resection of the primary tumor carries a significantly increased risk of complication. *Id.* 51:18-52:3. Although he acknowledged that most radiologists find it difficult to record an accurate percentage of metastases from the CAT scan, Dr. Cabot opined that Mr. Breton's metastases in March of 2007 involved less than twenty-five percent of his liver. *Id.* 47:23- 48:7.

Next, surgeons look to the age of the patient to assess the patient's overall medical condition and operative risks. *Id.* 52:8-53:2. Dr. Cabot said that he reserved loop colostomies for moribund patients, over the age of seventy, who posed "terrible operative risks." *Id.* 40:23-41:3. In Dr. Cabot's view, Mr. Breton did not fit any of these categories; despite his "known liver metastases," Mr. Breton was only fifty-four, in reasonably good health, and did not present an unusual operative risk. *Id.* 44:10-15.

Surgeons also consider the likely risks of leaving the primary tumor in the colon while chemotherapy is administered. *Id.* 53:3-12. For example, chemotherapy can cause the tumor to break down, bleed, or perforate the colon. *Id.* Dr. Cabot said that Mr. Breton's medical records indicated he had pre-surgical bleeding, which most likely came from the colon cancer. *Id.* 53:21-54:18.

Finally, Dr. Cabot explained that the surgeon has to take into account quality of life concerns. *Id.* 54:24-55:5. He said that no one is happy with a colostomy, as it invariably affects the person's quality of life and often causes depression. *Id.* 44:15-20. Thus, in Dr. Cabot's experience, a colostomy is a procedure to be avoided. *Id.* 44:20-25.

Under these circumstances, Dr. Cabot opined that the standard of care required Dr. Bossart to surgically resect Mr. Breton's primary tumor in September 2006. *Id.* 55:6-12. In his expert opinion, a colostomy was not within the proper standard of care. *Id.* 55:6-12. Confronted in March 2007

with a relatively young patient in good condition with a tumor that still had the potential to bleed and perforate and with a protruding stoma with complications, Dr. Cabot resected the tumor and took down the colostomy without any difficulty. *Id.* 48:8-15; *MSA* at 11. Although Mr. Breton suffered a post-operative infection, Dr. Cabot said this was somewhat expected for a patient with "a dirty piece of bowel sitting at the top of the wound." *Tr.* 49:25-50:16.

Dr. Cabot did not think there would have been any medically significant delay in getting Mr. Breton to chemotherapy after resection surgery when compared to the colostomy. *Id.* 57:17-25. Although he acknowledged that patients recover more quickly from a colostomy, which entails less risk and generally allows patients to get to chemotherapy sooner, the difference in recovery time would only have been a couple of weeks. *Id.* 57:17-58:16. This difference, in Dr. Cabot's opinion, should not have driven the operative decision. *Id.* The doctor also did not think that the time difference between Mr. Breton's colostomy surgery in September 2006 and his resection surgery in March 2007 was medically relevant to whether Mr. Breton could have successfully undergone resection surgery in September. *Id.* 45:12-17.

Dr. Cabot said Dr. Bossart should have, at a minimum, given Mr. Breton a choice. He stressed that the option of excision of the tumor should have been presented to Mr. Breton and the risks and benefits of the options—

colostomy versus resection—should have been discussed with him, so that the patient could make an informed decision about which alternative was right for him. *Id.* 55:21-56:8. If he had been in Dr. Bossart's position, Dr. Cabot said that he would have recommended resection but explained the colostomy option, as well as a no-action alternative. *Id.* 56:13-57:1. The doctor thought that if Mr. Breton had been given the resection option in September 2006 and had elected it, Mr. Breton likely would have done well and avoided the colostomy complications he endured. *Id.* 57:7-12. Although he did not testify that he thought Mr. Breton would have chosen the resection option, he did testify that Mr. Breton "was very excited about the possibility of resection" when he saw Dr. Cabot. *Id.* 49:11-12.

## C. The Government's Response

### 1. September 2006 and March 2007: Prolonging Life Versus Enhancing Its Quality

The Government vigorously contests the Estate's charge that Dr. Bossart's decision to perform the colostomy was medical malpractice or that he was required to inform Mr. Breton of the resection alternative before undertaking the colostomy. The Government distinguishes between two "vastly different" time periods: September 2006 and March 2007. *Id.* 10:1-7. Because of his deteriorating liver, in September 2006 despite his comparative youth, Mr. Breton had a "terrible prognosis." *Id.* 10:1-16. At that time, the Government says, Mr. Breton required chemotherapy as quickly as possible. *Id.* But before he could receive life-prolonging chemotherapy, Mr. Breton

required a low-risk operation that would circumvent his bowel obstruction—the loop colostomy. *Id.* 10:16-23. Because surgical resection of Mr. Breton's tumor involved a high risk of infection that would have "delayed chemo[therapy] and had an adverse effect on the patient's life," the Government argues that the "vast majority of surgeons in this country [and] anywhere in the world would have performed a colostomy." *Id.* 10:16-18, 11:9-16.

The Government discounts Mr. Breton's progress after the March 2007 surgery. It notes that Mr. Breton's medical condition had improved dramatically by March 2007. By the time Mr. Breton underwent the tumor resection, the chemotherapy had worked so well that it was possible to address the quality of life issue by removing the colostomy, excising the colon tumor, and restoring his bowel function. *Id.* 10:24-11:8. In short, the September operation was a "life-prolonging colostomy," whereas the March, 2007 operation was a "quality of life resection" made possible by the prompt colostomy Dr. Bossart performed in September 2006, which allowed the successful chemotherapy. *Id.* 11:17-12:2.

The Government concedes that Dr. Bossart did not offer Mr. Breton the option of surgical resection in September 2006. *Id.* 12:16-18, 249:16-17. But it says that neither would surgeons at the top of their field if the patient initially agreed to a colostomy. *Id.* 248:7-19. Rather, the Government argues that the surgeon's appropriate course is to inform the patient that he is going

to have a colostomy because that is the quickest way to chemotherapy. *Id.* 13:2-7. Moreover, even if Dr. Bossart had fully informed Mr. Breton, the Government concludes that a "reasonable patient [under the circumstances] would have still chosen colostomy, and under the Maine statute there is no liability" in that situation. *Id.* 13:11-16, 249:16-20.

## 2. Dr. David Ryan

In support of its defense, the Government called as an expert witness Dr. David Ryan, a medical oncologist at Massachusetts General Hospital (MGH). Dr. Ryan is a graduate of The College of the Holy Cross and Columbia Medical School. He is now Clinical Director of the MGH Cancer Center and has a sub-specialty in gastrointestinal cancer. He is also on the editorial board of the National Gastrointestinal Cancer Committee.

Dr. Ryan explained that when Mr. Breton came to see Dr. Bossart in September 2006, he had been diagnosed with inoperable and incurable cancer, which had metastasized into his liver. *Id.* 97:12-98:11. Because the cancer was distributed throughout the liver, a surgeon attempting to cut the cancer out would likely find there would not be enough of the organ left over to perform its essential digestive work. *Id.* 101:14-102:8. Mr. Breton thus fell into a group of patients with "categorically unresectable" liver cancer. *Id.* 101:24-102:5. Dr. Ryan testified that when faced with this dire prognosis, the proper standard of care is to get the patient to chemotherapy as quickly as possible. *Id.* 105:3-4. Even for patients who have mild bleeding due to

anemia, oncologists often start chemotherapy "right away." *Id.* 115:12-17. The prognosis for Mr. Breton—to prolong, not to save his life—was reasonably good, so long as he got chemotherapy quickly.

First, it was essential to attend to his obstructed colon, since to survive, he would need a functioning digestive system. *Id.* 103:11-14. In this circumstance, Dr. Ryan explained, surgeons try "to do as little damage as possible." *Id.* 104:23-25. Because it is often the "easiest, safest procedure," for preparing a patient with unresectable liver metastases to receive chemotherapy, surgeons generally prefer the same diverting ostomy procedure Dr. Bossart performed on Mr. Breton. *Id.* 105:3-4, 103:11-22, 104:23-105:5. This surgical option necessarily means that the primary tumor (in this case the colon cancer) is left alone for the time being. Dr. Ryan explained that for a patient who has incurable liver metastases, "taking out the primary [tumor] or leaving it in has very little to do with how long the patient [is] going to live" compared to the modern benefits of chemotherapy. *Id.* at 107:7-19. After an encouraging response to chemotherapy, surgeons may then resolve any quality of life issues relating to the colostomy. *Id.* 108:17-22.

Dr. Ryan acknowledged that no one wants a colostomy and there are not only physical, but psychological sequelae from the procedure. *Id.* 126:18-127:2. Occasionally, a surgeon will resect the primary tumor instead of performing a colostomy if the surgeon feels this is the quickest and safest

way to get the patient into chemotherapy. *Id.* 108:10-13. In a best case scenario, patients can get into chemotherapy in the same amount of time after either procedure. *Id.* 113:12-114:7. But a surgeon must be comfortable in his ability to perform a resection without subjecting the patient to "too high a risk of morbidity." *Id.* 123:7-20, 124:13-22.

One critical factor is the location of the primary tumor. If the tumor is located in an easily accessible place and the surgeon concludes that it can be readily removed, the surgeon may decide that a resection is preferable to a colostomy. *Id.* 109:3-6. However, if the tumor is located in the lower part of the colon, as in Mr. Breton's case, it is more difficult to excise, and a surgeon will typically perform the simpler and less invasive colostomy to prepare the patient quickly for a course of chemotherapy. *Id.* 109:3-9, 124:3-12. Although Dr. Ryan, from an oncologist's standpoint, saw nothing specifically in Mr. Breton's record that contraindicated a resection, he testified that he thought resection would carry a higher risk of complications based on its location. *Id.* 123:21-124:12. Ultimately, he conceded the decision is up to the surgeon, not the oncologist, based on that surgeon's experience. *Id.* 110:14-111:5, 124:13-18.

Dr. Ryan has participated with surgeons in informed consent discussions with patients like Mr. Breton. *Id.* 114:21-25. He agreed that it is generally the patient's choice whether to receive treatment and what treatment to receive. *Id.* 119:20-121:16. Thus, the standard of care generally

requires a physician to describe alternatives so that the patient will be able to make a rational choice. *Id.* This standard, however, only applies to alternatives that are "reasonable options," and a doctor has the obligation to make it plain to the patient the recommended course of treatment. *Id.* 121:19-122:13. Consequentially, a surgeon may decide not to disclose the possibility of resection to the patient in certain situations. For example, once the patient realizes that a colostomy is the best and quickest route to essential chemotherapy, the patient will often immediately make the decision to go with the surgeon's recommendation and submit to a colostomy.[8] *Id.* 128:13-19. Because it only diverts the patient from making what is clearly the better choice, in those situations Dr. Ryan testified that the surgeon (and the oncologist) often will not bring up the possibility of a resection. *Id.*[9]

### 3. Dr. David Berger

Dr. David Berger, a general surgeon at MGH with a subspecialty in colon-rectal surgery, also testified for the Government. Dr. Berger is a graduate of Harvard College and the University of Pennsylvania Medical School. He serves as an assistant professor of surgery at Harvard Medical

---

[8] Dr. Ryan acknowledged that often the discussion about surgical alternatives is "just . . . between the surgeon and the patient." *Tr.* 128:18-19. However, there are circumstances when the patient says "I really don't want an ostomy, please don't do an ostomy, and the surgeon asked [Dr. Ryan] to get involved or [he is] involved at that particular time." *Id.* 128:19-22. In such a case, Dr. Ryan and the surgeon will discuss the possibility of a resection, and why they recommend a colostomy, but this only happens if the patient asks whether he can "get the primary tumor resected." *Id.* 131:3-4. If the patient does not object to the colostomy, the discussion about a possible resection "doesn't automatically take place." *Id.* 131:5-6.

[9] Dr. Ryan also described situations where a surgeon recommends resection of the primary tumor, realizes during the course of surgery that the tumor is more extensive than tests indicated, and opts mid-surgery to perform a diverting ostomy "because the surgeon knows that we need to get the patient to chemotherapy as fast as we can." *Tr.* 110:21-111:5.

School and is the Colorectal Group Leader at the Digestive Health Center at MGH. Dr. Berger prefaced his testimony by stating that he had no criticism of either Dr. Bossart or Dr. Cabot. *Id.* 169:8-10.

Dr. Berger reviewed the history. In September, 2006, Dr. Bossart was presented with a patient who had an obstructing upper rectal/lower sigmoid tumor. *Id.* 169:13-17. In addition to suffering from diffuse liver metastasis, Mr. Breton had "stool which was blocked behind his obstructing lesion." *Id.* 169:18-20. The doctor explained that the intestine is like a pipe and, once clogged, feces cannot find its way out. *Id.* 170:14-21, 189:5-8. This causes the fecal material to accumulate behind the blockage and the intestine to stretch out, which itself presents a separate set of risks. *Id.* The obstruction simply has to be "taken care of," so that the fecal material can be evacuated. *Id.* 172:1-4.

When Mr. Breton saw Dr. Bossart, Dr. Berger confirmed that the surgeon's job was to get him as quickly as possible to chemotherapy, which he stressed would not be life-saving but likely life-lengthening. *Id.* 169:20-24. Without chemotherapy, Dr. Berger thought Mr. Breton's "life expectancy was probably six to nine months." *Id.* 171:5-22. Dr. Berger testified that the "safest and most expeditious" way to get Mr. Breton to chemotherapy was to perform a loop colostomy: exactly the procedure Dr. Bossart performed. *Id.* 171:25-172:7. Like Dr. Ryan, Dr. Berger explained that the primary rule for

physicians is "do no harm," and by far the safest approach consistent with this rule was the colostomy. *Id.* 172:10-25.

Dr. Berger evaluated the two alternatives to a colostomy. The first involves the use of a stent to provide a passage for fecal material to bypass the lesion. A gastroenterologist might "slide a stent up near the obstruction and . . . dilate the tumor up and then try and evacuate the stool and cure the obstruction and then go in and resect the tumor and the stent." *Id.* 174:22-175:6. Although there are currently gastroenterologists at MGH able to perform such a procedure, it was not available in Maine in 2006. *Id.* The second alternative is to perform a resection of the colon tumor, which is what Dr. Cabot did in March 2007. *Id.* 175:20-23.

Several factors, however, militated against performing the resection in September 2006. First, the location of Mr. Breton's tumor made resection surgery much more invasive than a colostomy, with higher risks of bleeding, coronary and lung problems. *Id.* 176:6-10.

Second, Mr. Breton presented with a high risk of infection because he "had an obstructed colon and that colon was full of stool . . . [and] bacteria" *Id.* 179:3-5. Before colon surgery is performed, the patient is commonly required to undergo an enema to flush feces and bacteria out of the colon. *Id.* 179:6-13. Without an enema, a patient presents with a colon full of feces and bacteria and bears a markedly increased risk of wound infection from the surgery. *Id.* 179:12-15. When obstructed, a colon also becomes "stretched

out," which further weakens its ability to fight infection, *id.* 179:16-24, and a patient with an active infection cannot begin a course of chemotherapy. *Id.* 176:21-22.

Third, Dr. Berger explained that chemotherapy, itself, often causes gastrointestinal problems, such as diarrhea. *Id.* 177:2-22. After a patient has had lower rectal surgery, dramatically shortening the length of the large intestine, the patient's susceptibility to diarrhea dramatically increases. *Id.* 177:2-13. In Mr. Breton's case, the combined result of the surgery and chemotherapy could have ultimately required that he wear adult diapers: a situation far worse than a colostomy. *Id.* 177:2-178:2.

Finally, Dr. Berger said that there was no need to extract the primary tumor for patients like Mr. Breton. He disagreed with Dr. Cabot about the risk of leaving the tumor intact. *Id.* 181:4-9. He said that, although it is true some types of tumors will break down and perforate with chemotherapy, the risk of a colon tumor doing so is remote, and these risks are not worth the other risks of surgery. *Id.* 182:2-14.[10] In fact, Dr. Berger explained that colon surgery is no longer considered an option for the majority of patients, who, like Mr. Breton, present with both colon cancer and unresectable liver cancer *Id.* 181:9-14. Rather, if the colon is unobstructed, the patient goes straight to chemotherapy. *Id.* 181:21-182:1.

---

[10] Although not strictly part of Mr. Breton's claim, Dr. Berger also testified that Mr. Breton's development of a protrusion of the colostomy was an expected result of the procedure. In Dr. Berger's words, it is not a question of whether a colostomy will herniate, but when. *Tr.* 182:21-183:1.

Turning to informed consent, Dr. Berger disagreed that Mr. Breton should have been told about the possibility of a tumor resection. He said that surgeons know that the best alternative for a patient is a colostomy, but they also know that no one wants to have one. *Id.* 185:12-186:18. Typically, surgeons will offer the colostomy as their single recommendation, since it is "by far the safest way to go." *Id.* 186:15-18. If the patient agrees, the surgeon will not usually explore other alternatives, such as tumor resection. *Id.* 185:12-23. Even if the patient initially balks, surgeons still present colostomy as the best available course without mentioning specific alternatives. *Id.* 185:24-186:18. It is only if the patient absolutely refuses to have a colostomy that a surgeon will review the possibility of a tumor resection. *Id.* 186:19-22. Even then the doctor will still recommend a colostomy. *Id.* 186:22-25. Agreeing that informed consent in this circumstance makes for a "tough conversation," Dr. Berger stated unequivocally that almost all patients choose to have the colostomy and in his view a reasonable patient would make that choice. *Id.* 187:17-25.

## II.    DISCUSSION

### A.    The Cause of Action: The Federal Tort Claims Act

The Estate seeks to hold the United States liable for medical malpractice under the Federal Tort Claims Act 28 U.S.C. § 2671 *et seq.* (FTCA). The FTCA provides that "the United States shall be liable, respecting the provisions of this title relating to tort claims, in the same

manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. The plaintiff bears the burden of establishing the liability of the United States "by showing that a private individual would be liable under state law—Maine law, in this case—for similar conduct in the same circumstances." *Dubois v. United States*, 324 F. Supp. 2d 143, 148 (D. Me. 2004) (quoting *Clement v. United States*, 772 F. Supp. 20, 26 (D. Me. 1991)). The plaintiff's cause of action must be "tried by the court without a jury." 28 U.S.C. § 2402.

### B.     The Medical Malpractice Claim:  The Elements in Maine

To prove medical malpractice under Maine law, a plaintiff must establish: "(1) the appropriate standard of medical care, (2) the defendant's deviation from that recognized standard, and (3) that the conduct in violation of that standard was the proximate cause of the plaintiff's injury." *Ouellette v. Mehalic*, 534 A.2d 1331, 1332 (Me. 1988); *see also Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me. 1979) (same); *Caron v. Pratt*, 336 A.2d 856, 858-60 (Me. 1975) (same). Ordinarily, plaintiffs must produce expert testimony to sustain their burden. *Cox*, 406 A.2d at 622; *Cyr v. Giesen*, 150 Me. 248, 251, 108 A.2d 316, 318 (1954).

The standard of care applicable to the defendant and its agents is "that degree of skill and knowledge ordinarily possessed by physicians in [the physician's] branch of medicine." *Clement*, 772 F. Supp. at 26 (quoting *Downer v. Veilleux*, 322 A.2d 82, 87 (Me. 1974)). It is the plaintiff's burden to

establish "the appropriate standard of medical care, showing the defendant's deviation from that recognized standard, and showing that the conduct in violation of that standard was the proximate cause of [the plaintiff's] injuries." *Ouelette v. Albert*, 628 A.2d 1027, 1028 (Me. 1993). A medical specialist "should be held to national standards of care and treatment appropriate to the specialty." *Roberts v. Tardif*, 417 A.2d 444, 452 (Me. 1980).

### C. The Complaint: Liability on Two Grounds[11]

#### 1. Surgical Resection Versus Colostomy

The Estate claims Dr. Bossart violated the standard of care when he performed a colostomy on Mr. Breton in September 2006. Because he was "under 65, he had liver metastases under 50%, he was in relatively good health, and there were potential risks of future perforation or bleeding if the tumor was left in," as well as quality of life concerns, the Estate claims that colon resection "was the best option." *Pl.'s Br.* at 7-8.

Dr. Ryan and Dr. Berger unequivocally opined that the proper standard of care for someone in Mr. Breton's position was to bring him to chemotherapy as quickly and safely as possible. *Tr.* 97:19-98:7, 104:23-105:5

---

[11] Although not explicitly pressed, Mr. Breton's Estate also claims that Dr. Bossart did not follow the appropriate standard of care under Maine law when he failed to put the proper notation in Mr. Breton's pre-surgery file regarding Mr. Breton's medical history, his assessment of Mr. Breton's current medical condition, and the doctor's surgical plan for Mr. Breton. *Pl.'s Trial Br.* at 4 (Docket # 21); *Pl.'s Br.* at 9. There is no question this deviated from the standard of care, as Dr. Bossart himself admitted. *Tr.* 74:8-15 (Dr. Cabot's testimony), 183:2-10 (Dr. Berger's testimony), 17:16-23 (Dr. Bossart's testimony). To the extent the Estate asserts this violation as a separate claim, however, the Court rejects it because it did not prove through expert testimony that this "conduct in violation of that standard was the proximate cause of the plaintiff's injury." *Ouellette*, 534 A.2d at 1332.

(Dr. Ryan's testimony), 169:20-24 (Dr. Berger's testimony). Dr. Bossart recognized this standard. *Id.* 151:13-16. Given the advances in chemotherapy over the last 10 years, "chemotherapy gives [patients] the best chance at the best-case scenario, which is living for as long as you possibly can." *Id.* 98:5-7. Although Dr. Cabot testified that a colostomy "was not within the standard of care," he did not contradict the overarching need for quick and safe chemotherapy. *Id.* 55:10, 57:17-58:16 (testifying that a patient can receive chemotherapy in roughly the same amount of time after either procedure if they do not experience any complications), 64:4-17 (testifying that the extent of metastases in Mr. Breton's surgery required chemotherapy treatment, which has improved over the last five to ten years). Thus, as a general matter, the parties agree that Mr. Breton needed to be brought quickly to chemotherapy; they disagree on the proper surgical procedure to achieve this end.

This leads to the issue of whether Mr. Breton's Estate has demonstrated that Dr. Bossart's colostomy deviated from this standard of medical care. The Court readily resolves that the Plaintiff failed to sustain its burden to show a deviation from a recognized standard. The evidence convincingly shows that the loop colostomy was not merely an acceptable alternative to a resection; it was the preferred alternative. Although Mr. Breton was still relatively young when he presented in September 2006, he had a large amount of inoperable metastases in his liver that left him

weakened. *Id.* 63:25-64:8. His tumor was located in the lower rectum, making excision both more difficult and more invasive. *Togus* at 563. His colon wall was weak from dilation. *Tr.* 179:16-24. He was also an "impending diabetic," a heavy smoker, and had hypertension—all of which further increased his risk of complications from resection surgery. *Id.* 146:8-13, 156:4-9. Finally, his colon was obstructed—the root cause of surgery.[12] Because of the high risk of complications from resection surgery, Dr. Bossart testified that a colostomy was the safest and quickest way to bring Mr.

---

[12] At trial, Mr. Breton's Estate responded by contesting the extent of Mr. Breton's rectal obstruction. It argued that Mr. Breton's medical records contradict Dr. Berger's testimony that Mr. Breton's obstruction rendered the risk of infection too high to safely perform a resection. *Id.* 170:12-21,176:10-21. Several factors, the Estate claimed, supported its conclusion. For example, when Dr. Evans performed a flexible sigmoidoscopy and an EGD on Mr. Breton on September 21, 2006, he made no note of any stool in the digestive tract or of any difficulty visualizing the structures. *Mayo* at 4-5. Mr. Breton's record also indicates that when Togus admitted him on September 25, 2006, he was passing "small, hard, moose size nuggets, stool which is painful when defecating" and that, sometime that afternoon, he passed a "large . . . formed stool," the "first real stool" Mr. Breton said he had passed "in a long time." *Togus* at 325, 329. Contrary to Dr. Berger's testimony, the Estate argued that the record reflected that Mr. Breton's bowel was sufficiently decompressed to safely undergo tumor resection in September, 2006. *Tr.* 227:19-228:20.

Acknowledging that a sigmoidoscopy and EGD require the same bowel preparation as a colostomy, Dr. Berger explained that Mr. Breton's bowel condition a week before was irrelevant to his condition right before his colostomy. *Id.* 192:22-193:7. A week, he testified, is sufficient time to reclog the digestive tract. *Id.* 193:21-22. In fact, Mr. Breton reported constipation the next day and indicated that he had lost 50 pounds over the last two years, *Togus* at 328, 588. Dr. Krull, the oncologist, recommended surgical relief of an obstruction to bring Mr. Breton to chemotherapy. *Mayo* at 4-5; *Togus* at 563. Mr. Breton's records also indicate that the EGD scope could not advance beyond the cancerous lesion in the colon. *Mayo* at 4-5. Although there was some evidence that Mr. Breton moved his bowels in the week leading up to his colostomy, Dr. Berger testified that this could be the result of residual stool located below the obstruction. *Tr.* 194:5-16. "[H]ard nuggets," the doctor testified, are indicative of residual stool. *Id.* 195:11. Dr. Berger also explained that colon obstructions typically do not completely block the rectum; rather, the obstruction has a "ball valve effect" that may leave a narrow opening. *Id.* 189:18-190:1. Such an obstruction may be created after a single meal. *Id.* 199:18-22. Little bits of liquid could still pass around this obstruction, accounting for some of Mr. Breton's smaller bowel movements. *Id.* 195:3-11. Given this testimony and evidence, the Court finds that Mr. Breton's colon was sufficiently obstructed so that resection surgery in September, 2006 carried a quantifiably higher risk of infection than a colostomy.

Breton "unobstructed," to "chemotherapy and . . . out of the hospital as fast as [h]e could." *Id.* 151:10-16. Guided by the principal of "first do no harm," Dr. Ryan and Dr. Berger confirmed that Dr. Bossart correctly recommend a loop colostomy as the safest and quickest way to bring Mr. Breton into chemotherapy under these conditions. *Id.* 105:3-4, 103:11-22, 104:23-105:5 (Dr. Ryan's testimony), 171:25-172:7 (Dr. Berger's testimony).

Dr. Cabot's opinion to the contrary was simply not convincing. First, Dr. Cabot conceded that resection is generally a higher risk procedure than a colostomy. *Id.* 64:18-20. Second, Dr. Cabot conceded that at least as regards the question of resecting a metastasized liver, whether to perform the surgery is best left to the surgeon's judgment. *Id.* 52:8-12 (Dr. Cabot testified that "you can't take one thing, especially a subjective thing, and use that as your sole criteria for making that decision; it's a surgical decision judgment."). Dr. Cabot thus emphasized the importance of a surgeon's judgment for the procedure that was not performed, but not for the procedure that was. Nor was Dr. Bossart a novice at colon resections; he had performed about twenty-five hundred in his career. *Id.* 15:23-16:4. The Court concludes that the reason Dr. Bossart did not perform a resection in September 2006 was because he thought the colostomy was preferable for Mr. Breton and that his view is consistent with an appropriate standard of medical care.

The later success of Dr. Cabot's resection does not change this conclusion since Mr. Breton's medical condition had vastly improved by

March 2007. Fecal material was no longer obstructed in his bowel, and his bowel was no longer dilated. *Id.* 170:3-4. By March 2007, Mr. Breton likely had better nutrition and strength than in September 2006. *Id.* 179:25-180:10. Considering the fact that Mr. Breton developed an infection from the March 2007 resection surgery despite having an unobstructed colon, Dr. Berger testified that the risk of infection would have been "five to ten times higher" in September 2006 than in March. *Id.* 180:11-17. In addition, because Mr. Breton had already received the critical chemotherapy, the risk of infection would have played "significantly less role in the overall treatment plan" when Dr. Cabot performed the resection surgery. *Id.* 180:18-25. Although Dr. Cabot did not agree that there was any relevance in distinguishing between the two time periods, the Court does, and therefore finds that Dr. Cabot's ability to successfully perform resection surgery in March 2007 does not establish that he could have done so in September, 2006.

Viewed most charitably to the Plaintiff, the Estate demonstrated merely that there were two surgical alternatives for Mr. Breton in September 2006: a resection or a colostomy. Dr. Bossart chose the colostomy. A choice between two acceptable alternatives is not, however, medical malpractice. "Even if the evidence could be construed to suggest that an alternative treatment would have been feasible, a physician does not incur liability

merely by electing to pursue one of several recognized courses of treatment." *Downer*, 322 A.2d at 87.

Because the Estate did not establish that the "treatment pursued by the defendant was something other than that which the average and reasonably skilled" surgeon would have employed, the Court finds that Dr. Bossart did not deviate from the standard of care when he recommended and performed a loop colostomy for Mr. Breton. *Id.*

### 2. Informed Consent

The Estate claims that the appropriate standard of surgical care required Dr. Bossart to present Mr. Breton with the other surgical alternative to the colostomy surgery, specifically surgical resection.[13] *Pl.'s Br.* at 9-10.

---

[13]  Both the Estate and the Government cite 38 C.F.R. § 17.32(a) as establishing the informed consent standard for medical malpractice claims against the Veterans' Administration under the FTCA.  *Pl.'s Br.* at 7-8; *Def.'s Proposed Findings of Fact & Conclusions of Law* at 41 (Docket # 42) (*Def.'s Br.*).  The Court is not sure.  First, a "violation of a federal statute by governmental actors does not create liability" under the FTCA "unless state law would impose liability."  *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 536 (1st Cir. 1997).  In *Dimmick v. Regents of the Univ. of Cal.*, No. C 04-4965 PJH, No. C 05-0971 PJH, 2006 U.S. Dist. LEXIS 35480 (N.D. Ca. Feb. 3, 2006), the District Court rejected an analogous proposition based in part on 38 C.F.R. § 17.32:

> [T]o the extent that the cited federal regulations contain the duties articulated by the plaintiff, neither the regulations nor the duties set forth within those regulations have been adopted or incorporated into California law by *any of the California code sections cited by Dimmick.* . . . Accordingly, because a breach of duty created by federal law is not actionable under the FTCA, and California law does not create a duty to investigate and to establish complaint procedures, there is no basis for finding a waiver of sovereign immunity.

Whether this Department of Veterans Affairs regulation affects the standard of care for informed consent under Maine law is a different question.  In the context of this case, the Court views the informed consent standards in both state law and federal regulation as congruent since the regulation requires the physician to inform the patient about "reasonable

### a. Maine Law of Informed Consent: The Professional Standard

In 1974, Maine adopted the informed consent doctrine, which requires a physician

> to disclose to his patient the proposed diagnostic, therapeutic or surgical procedure to be undertaken, the material risks involved therein and the alternatives available, if any, so that a patient of ordinary understanding, confronted with these disclosures, and faced with a choice of undergoing the proposed treatment, or selecting an alternative process, or preferring refusal of all medical relief, may, in reaching a decision, intelligently exercise his judgment by balancing the probable risks against the probable benefits.

*Downer*, 322 A.2d at 90-91. Left open was whether the standard for determining what must be disclosed would be a "professional standard" or a "material risk standard." *See* Jack H. Simmons, Donald N. Zillman, David D. Gregory, Maine Tort Law § 9.12 (2004 ed.) (Maine Tort Law). A "professional standard" is what a reasonable medical practitioner in the same branch of medicine would disclose in the same or similar circumstances; a "material risk standard" protects "the patient's right to self-determination" and is measured, not by the standards of the medical profession, but by the "patient's need for the information." *Woolley v. Henderson*, 418 A.2d 1123, 1129 (Me. 1980). Significantly, a doctor's obligations under the "material risk standard" need not be determined by expert testimony; under the

---

and available alternatives." 38 C.F.R. § 17.32(c). The Estate has failed to demonstrate that a resection of the bowel lesion was a "reasonable and available alternative[]" in September 2006.

"professional standard," however, the physician's disclosure obligations require expert proof. *Id.*

In *Woolley*, the Maine Supreme Judicial Court resolved this issue by adopting the "professional standard." *Id.* at 1131. The *Woolley* Court emphasized that "[t]he physician's attention must be focused on the best interests of his patient and not on what a lay jury, unschooled in medicine, may, after the fact, conclude he should have disclosed." *Id.*

Before the Maine Law Court decided *Woolley*, but after the cause of action in *Woolley* arose, the Maine Legislature enacted 24 M.R.S. § 2905 (Supp. 1980). *See* John C. Milazzo, Note, *Informed Consent in Maine: Woolley v. Henderson and the Informed Consent Statute*, 34 Me. L. Rev. 311 (1982) (listing time line). Section 2905 reads in relevant part:

> **1. Disallowance of recovery on grounds of lack of informed consent**. No recovery may be allowed against any physician . . . upon the grounds that the health care treatment was rendered without the informed consent of the patient . . . when:
>
> > **A.** The action of the physician . . . in obtaining the consent of the patient . . . was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities;
> >
> > **B.** A reasonable person, from the information provided by the physician . . . under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other physicians...engaged in the same field of practice in the same or similar communities; or

**C.** A reasonable person, under all surrounding circumstances, would have undergone such treatment or procedure had that person been advised by the physician . . . in accordance with paragraphs A and B or this paragraph.
. . .

**2. Presumption of validity of written consent; rebuttal.** A consent which is evidenced in writing and which meets the foregoing standards, and which is signed by the patient . . . shall be presumed to be a valid consent. This presumption, however, may be subject to rebuttal only upon proof that such consent was obtained through fraud, deception or misrepresentation of material fact.

24 M.R.S. § 2905(1)(A)-(C) & (2). The statute's language—"in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities"—legislatively enacts the "professional standard" the Maine Supreme Judicial Court adopted in *Woolley*. *See* Maine Tort Law § 9.13.

### b. Deviation From the Professional Standard

To prevail on the second element of its Maine medical malpractice claim—deviation from the standard of care—the Estate must prove that Maine's professional standard required Dr. Bossart to present the alternative of surgical resection to Mr. Breton before obtaining his consent to perform the colostomy. Before surgery, Mr. Breton signed a standard Veterans Administration consent form that acknowledged his consent to undergo a mid-transverse loop colostomy. Ex. 101, *Veterans Affairs Consent Form*.[14]

---

[14] At trial, Dr. Bossart called the signed consent form an "operative permit." He explained that, in his mind, an operative permit is simply a form that a surgeon presents to a patient

Mr. Breton's signed consent is only presumptively valid if it is in compliance with 24 M.R.S. § 2905(1)(A)-(C). Mr. Breton's Estate argues the form is not presumptively valid because Dr. Bossart conceded that he did not discuss with Mr. Breton any alternative surgical procedures and specifically admitted that he did not discuss with Mr. Breton the option of a surgical resection. *Tr.* 26:2-11.[15]

In contrast, the Government argues that the form is presumptively valid because it is in compliance with 24 M.R.S. § 2905(1)(A)-(C). First, it claims that its experts have shown that "members of the same health care profession with similar training and experience situated in the same or similar communities" would also not have disclosed the surgical resection alternative under these circumstances because it is no longer a recognized alternative. 24 M.R.S. § 2905(1)(A) & (B); *Def.'s Br.* at 44. Second, the Government asserts that its expert testimony conclusively establishes that a

---

prior to surgery that "[j]ust put[s] down what's going to be done." *Id.* 16:20-25. Informed consent, on the other hand, is an "oral encounter" in which a doctor "sit[s] down and talk[s] with the patient . . . in English" about the procedure to be performed. *Tr.* 17:8-15.

[15] During trial, the Estate also argued that the standard of care obligated Dr. Bossart to inform Mr. Breton that a resection remained a possibility after the colostomy. *Tr.* 231:13-20. The Government responded that Mr. Breton did not provide any expert testimony putting the Government on notice that this was an issue in the case. *Id.* 244:3-10. Without this expert testimony, the Government argued, there could be no malpractice claim for failing to explain that resection was an alternative down the road. *Id.* 244:13-17. Because the Government is responsible for the "foreseeable consequences of [its] negligent actions," the Estate replied that the lack of expert testimony on this point is not "entirely relevant." *Id.* 251:2-6. Therefore, it did not need "expert testimony that the continuing failure of Dr. Bossart to raise the issue is a separate act of negligence." *Id.* 252:7-10.

Mr. Breton, however, never kept his appointment with Dr. Bossart to surgically address his colostomy, and the Court cannot speculate what procedure Dr. Bossart would have performed. Furthermore, the Court concludes the point is moot as Mr. Breton had a surgical resection in March of 2007. Finally, the Court finds that a reasonable patient would even more readily choose a colostomy if he knew it was not a permanent burden.

"reasonable person, under all surrounding circumstances, would have undergone such treatment or procedure had that person been [properly] advised by the physician . . . ." 24 M.R.S. § 2905(1)(C); *Def.'s Br.* at 43. The Court agrees with the Government.

The Court finds the informed consent Dr. Bossart obtained is in compliance with 24 M.R.S. § 2905(1)(A) & (B). Both Dr. Ryan and Dr. Berger testified that it is common for a surgeon not to inform a patient with a tumor partially obstructing his lower colon that surgical resection of that tumor is an alternative. *Tr.* 128:13-131:6 (Dr. Ryan's testimony), 185:12-186:18 (Dr. Berger's testimony). For a patient in Mr. Breton's condition, surgeons usually present a colostomy as the patient's only option because it is by far the safest and most effective procedure for preparing the patient for chemotherapy. *Id.* 128:13-131:6, 185-12-186:18. If the patient agrees, surgeons do not want to mislead their patient into thinking the unfortunate consequences of a colostomy are avoidable by suggesting riskier alternatives. *Id.* 128:13-131:6, 185-12-186:18. Only if the patient absolutely refuses to undergo the procedure do surgeons explain the resection alternative, and then only in couched terms. *Id.* 186:19-22. There is no evidence that Mr. Breton did not initially and unequivocally accept Dr. Bossart's colostomy recommendation.

Although the Court generally agrees with Dr. Cabot's view that surgeons have an obligation to disclose the risks and benefits of a patient's

surgical options, Dr. Ryan explained that the duty to disclose only applies to alternatives that are "reasonable options." *Id.* 55:21-56:8 (Dr. Cabot's testimony), 121:19-21 (Dr. Ryan's testimony). In other words, the alternative must be "recognized and followed by other physicians . . . engaged in the same field" under similar medical circumstances. 24 M.R.S. § 2905(B). Surgeons do not fulfill their legal obligations to their patients by suggesting the possibility of an alternative that in their best surgical judgment they do not believe is either reasonable or recognized. *Id.* 120:20-24, 121:19-21, 187:15-17.

As Dr. Berger and Dr. Ryan explained, the reasonableness and recognition of a resection for patients like Mr. Breton has been eclipsed by medical advances. For one, as Dr. Ryan explained, there have been dramatic advances in chemotherapy over the last twenty years. In 1996, for example, only one chemotherapy drug was available for patients like Mr. Breton; now there are five. *Tr.* 103:25-104:8. Because of the availability of modern chemotherapy, a tumor resection rarely prolongs a patient's life, and the risks of leaving the primary tumor intact, such as bleeding and perforation, no longer outweigh the rewards of expedient chemotherapy. *Id.* at 107:12-19. In some cases, chemotherapy can even shrink the size of the primary tumor to the point that surgical resection becomes possible for high risk patients like Mr. Breton. *Id.* 104:14-18, 116:13-21. When the tumor shrinks, bleeding

also decreases. *Id.* 181:23-25. Additionally, colon tumors generally do not present a meaningful risk of perforation. *Id.* 182:2-14.

Dr. Ryan also explained that the "surgical management of liver metastases has evolved." *Id.* 102:12-13. Fifteen to twenty years ago, the "number of liver metastases was the most important" factor in determining whether the liver was resectable. *Id.* 102:13-17. "[I]f someone had one or two liver metastases they were surgically resectable. If they had more than three, they weren't surgically resectable." *Id.* 102:115-18.

Today, although it is still true that "the more liver lesions you have the less likely you are to be cured," the better measure for whether surgery will be performed on the liver is whether "a gifted liver surgeon [can] render you free of disease and leave enough liver behind so you're your body can function and that you can live." *Id.* 102:19-23. If someone is being considered for liver surgery, it is necessary to "leave behind approximately 30 percent functioning liver." *Id.* 102:1-2. The "amount that the tumor is involving isn't really germane to the case. It's whether or not the surgeon can technically render the patient free of all disease." *Id.* 103:3-6. If it is determined that "somebody has surgically unresectable matastases and is clearly incurable from a surgical standpoint, the goal of the surgeon is basically to render the patient with a functional GI tract so that [the oncologist] can start chemotherapy as fast as [the oncologist] can." *Id.* 103:18-22. In Mr. Breton's case, the physicians agreed that his liver was inoperable. *Id.* 63:9-12 (when

asked whether he agreed that the liver was inoperable, Dr. Cabot responded "That's correct, sir.").

Finally, although quality of life considerations may have rendered resection the preferred surgery before modern medical advances, patients who have a tumor removed from the lower rectum today can experience graver quality of life consequences when they are ready for chemotherapy than if they had received a colostomy. *Id.* 177:2-178:2 (Dr. Berger's testimony concerning the potential need for an adult diaper with resection).

Because modern medicine no longer recognizes as reasonable the surgical resection of a colon tumor for someone in Mr. Breton's condition, explaining this alternative to Mr. Breton after Dr. Bossart had obtained his consent to a colostomy would not have benefited him. In fact, it may have confused Mr. Breton into thinking that the burdens associated with his colostomy were avoidable, when they were not. The Law Court recognized such a potential when it said, "[c]onceivably, full disclosure under some circumstances could constitute bad medical practice." *Woolley*, 418 A.2d at 1130.

Furthermore, the informed consent Dr. Bossart obtained from Mr. Breton is in compliance with 24 M.R.S. § 2905(1)(C). There can be no liability when "[a] reasonable person, under all surrounding circumstances, would have undergone such treatment or procedure had that person been advised by the physician . . . in accordance with [24 M.R.S. 2905(1)(A) and

(B)]." 24 M.R.S. §2905(1)(C). The Estate offered no evidence that Mr. Breton would have elected resection if he had been aware of that option. The expert testimony showed that a reasonable patient in Mr. Breton's condition—fully informed of the colon tumor's inaccessible location, the severe risk of infection his partially blocked rectum posed, and the lack of medical benefit in removing the tumor—would have accepted Dr. Bossart's recommendation. *Tr.* 109:14-110:2 (Dr. Ryan's testimony), 187:20-25 (Dr. Berger's testimony). The Court therefore finds that Dr. Bossart did not commit medical malpractice under Maine law by failing to mention the possibility of a resection of Mr. Breton's bowel lesion in September 2006 and, therefore, that the Government is not liable to the Estate under 24 M.R.S. § 2905. *Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir. 1984) (stating that "[t]he issue of informed consent must rest on foresight, not hindsight").

The Court recognizes that Mr. Breton suffered physically and psychologically from a debilitating and depressing, though not uncommon, experience with his colostomy. Even without complications, all the physicians agreed a colostomy is an undesirable procedure with potentially distressing consequences. Yet, some medical procedures like colostomies carry irreducible risks and inherent disadvantages but they are still in the patients' overall best interest. Because a patient encounters one of the recognized disadvantages, this does not mean the procedure should not have been done in the first place. Despite the remarkable advances in medical

science, the practice of medicine cannot insure against all harm, and a "poor result, standing alone, is insufficient to establish liability." *Downer*, 322 A.2d at 87.

Though understandable, Mr. Breton's anger was misplaced: if the alternatives were equal, there is no doubt that a reasonable person would choose an uncomplicated resection over a degrading colostomy. But Mr. Breton did not face equal alternatives. The Court accepts the defense experts' view that the only true choice for Mr. Breton was the one he underwent: a colostomy. The wisdom of Dr. Bossart's surgical choice is demonstrable: Mr. Breton recovered quickly enough from the colostomy to undergo life-prolonging chemotherapy, by March 2007, his colon cancer was safely resected, and in the end, although he still died too young, he beat predictions by living until August 5, 2009.

With this conclusion, the Estate's claim against Togus must fail.

## III.     CONCLUSION

The Court concludes that the Togus Veterans Administration Medical Center did not commit medical malpractice under Maine law when Dr. Bossart performed a colostomy on Kenneth Breton in September 2006 and when Dr. Bossart did not inform Mr. Breton about the possibility of a alternative surgical procedure, the resection of his bowel lesion. The Court GRANTS judgment in favor of the Defendant United States of America and

against Plaintiff Nancy Breton, Personal Representative of the Estate of Kenneth L. Breton.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 14th day of September, 2010